54 CCPA

**Application of Robert A. BOYER, Arthur A. Schulz and Edmond A. Schatzman.**

**Patent Appeal No. 7701.**

United States Court of Customs and Patent Appeals.

April 27, 1967.

Smith, J., dissented.

J. Harold Kilcoyne, Washington, D. C., John D. Pope, III, St. Louis, Mo., for appellants.

Joseph Schimmel, Washington, D. C. (J. F. Nakamura, Washington, D. C., of counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH, ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals affirming the examiner's rejection of claims 1–12 in appellants' application,[1] entitled "Method of Manufacturing a Protein Food Product," as obvious in view of the prior art.

The invention relates to a method of forming edible protein products designed to simulate natural meats of mammals, fish or fowl. According to the specification, the protein products produced by processes disclosed in certain prior art patents were too dark in color and possessed relatively poor flavor and texture. Appellants treat various protein materials—soy or casein protein, for example—with sulfite ma-

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Serial No. 168,807, filed January 25, 1962.

terials[2] to produce a product having lighter color, improved flavor and texture, and increased resistance to bacterial and fungal growth, as reflected in claim 1:

1. The method of forming an edible protein product which comprises precipitating protein from a protein-containing solution, said precipitation being carried out under spinning conditions to form the precipitating protein into filaments, and treating the protein with at least approximately 0.25% by weight of a sulfite.

The references are:

Smith et al. 2,370,266 Feb. 27, 1945.
Boyer 2,682,466 June 29, 1954.

Recognizing that Boyer, one of the prior art patents cited in appellants' specification, meets the terms of the claims except for treatment of the protein with sulfite, the examiner turned to Smith, who discloses that an industrial problem relating to the dark color of soybean, peanut, casein or cottonseed protein may be obviated by treating them with 0.25–3% sodium hydrosulfite to lighten the protein color. The proteins which Smith treats in that manner are used in the paper coating industry or "wherever a light colored protein is required." "[I]t would be obvious," said the examiner, "to treat the Boyer protein filaments with the Smith et al. protein-improving agent." The board agreed.

■ We appreciate appellants' arguments directed to the allegedly nonanalogous nature of the Smith patent to the problem at hand, as well as the arguments and affidavits relating to the "appearance," "appeal," "flavor," "texture" and "aroma" of appellants' sulfite-treated products in comparison with the products of the prior art. But, as the board and solicitor point out, an improvement in color of Boyer's protein product which can be used to simulate the white meat of fowl, and a concomitant improvement in appeal and appearance, might well be expected from sulfite treatment in view of the Smith reference. Considering all the evidence, we think sufficient reason is provided by the prior art for doing what appellants have done, and we find no reversible error in the decision below.

Appellants also ask us to reverse the decision of the Director of the Chemical Examining Operation, acting for the Commissioner of Patents, refusing to direct the examiner to enter claims 14–21, submitted after appeal had been taken to the board and the examiner's Answer written,[3] for purposes of interference with an issued patent. The examiner found, and the Director agreed, that the claims sought to be entered were not supported by appellants' application. In its decision, the board regarded such action to be "a matter which is not appealable" to it.

■■ Until such time as the board has ruled on the patentability of claims 14–21 to appellants in an application properly presenting them, we cannot review that question. See In re Pavlecka, 319 F.2d 180, 50 CCPA 1342; In re Smitley, 296 F.2d 767, 49 CCPA 803; In re Korum, 154 F.2d 185, 33 CCPA 923. We are without authority to review the action of the Commissioner in matters of this nature. 35 U.S.C. § 141; In re Jewett, 247 F.2d 953, 45 CCPA 714, and cases cited therein.

The decision is affirmed.

Affirmed.

SMITH, Judge (dissenting).

The inquiry here under section 103 is whether, considering the differences between the claimed subject matter and the "prior art," appellants' invention

---

2. Appellants use such sulfites as sodium sulfite, sodium metabisulfite, and sodium hydrosulfite. Webster's New International Dictionary, 3rd Edition, 1961, defines "sodium sulfite" as "the crystalline normal salt $Na_2SO_3$ used chiefly as a reducing agent, bleaching agent, and antichlor, in * * * preserving foods," and "sodium metabisulfite" as "a compound $Na_2S_2O_5$ * * * used chiefly as a reducing agent, bleaching agent, and antichlor, in preserving foods and silage * * *.

3. See Patent Office Rule 116(c).

would have been obvious *at the time it "was made to a person having ordinary skill in the art to which said subject matter pertains."* I am unable to agree with the majority opinion which seems to me to ignore the above italicized portions of section 103. Considering the *prior art of record,* and evaluating it in view of *all* of the requirements of section 103, I would find appellants' invention to be nonobvious.

The appealed claims were rejected "as being unpatentable over Boyer, in view of Smith." Of these references only Boyer was concerned with an edible protein product. Concerning this reference appellants' specification states:

This invention relates to a method of manufacturing a protein food product and more specifically to the preparation of a *product which is an improvement over those disclosed in U. S. patents 2,682,466* [Boyer], 2,730,447 and 2,730,448. [Emphasis added.]

Boyer sought to provide "a low cost but satisfactory substitute for meat." According to Boyer,

* * * The stumbling block up to this point has been in the reproduction of the texture and appearance of natural meat, the texture of course involving the factor of "chewiness." * * *

Boyer discloses a process to produce

* * * a product which closely resembles natural meat as to its appearance, as to its fibrous qualities, as to its flavor, as to its nutritive value, and as to its chewiness.

The product, according to Boyer, should "closely simulate the white meat of chicken or turkey * * * filet mignon or a pork chop or other specific types and cuts of meat available in butcher shops." Boyer started with protein fibers, resulting from spinnerets, or extruded proteins, admittedly old products. The fibers were then treated with edible binders and fats.

Boyer teaches that "toughness" of the product could be controlled through the use of "hardening, tanning, or in-solubilizing chemicals" or through stretching the fibers to increase tensile strength. Tenderizing, when desired, could be accomplished through the use of "proteolytic enzymes." Flavor could be controlled by adding the fat of the particular meat simulated. Texture could be controlled through assembly pressures. As for color, Boyer states:

Regardless of the initial procedure in producing the filaments, the filaments will normally be approximately the color of the starting protein. If a coloring agent is added to the protein dispersion, the resulting filaments will retain the approximate color of the dye. * * *

Such are the teachings of record specifically directed to *edible protein products and processes,* the subject matter of concern to appellants.

I shall now consider the teachings of Smith. The patent states:

In the industrial utilization of protein there are several properties which are of primary importance, such as color, adhesive strength, viscosity, plasticity, and dispersibility. In the specialized field of paper coatings two of the most important properties are color and adhesive strength. For high grade paper coatings casein is used more than any other protein because, in addition to having very good adhesive strength, it approaches more nearly to a white color than other commercial proteins which has [sic] been used for this purpose. Soybean protein is used to a limited extent for paper coating, but its general acceptance for this application has been prevented by its dark color.

The present invention has to do with a soybean protein which is much lighter in color than any prepared heretofore and for this reason is especially suited to fulfill the need for a cheaper adhesive in the paper coating industry and also for protein plastics and wherever a light colored protein is required. * * *

Smith teaches the addition of sodium dithionite salts or dithionous acids,

which act as bleaching agents, to yield lighter colored proteins for industrial application, particularly in the paper coating industry.

Turning to appellants' specification for a more detailed consideration of their invention, it is stated:

> While valuable edible protein products can be prepared utilizing the teachings of U. S. patents 2,682,466 [Boyer], 2,730,447 and 2,730,448, these products may be darker in color than desired, may possess sufficient rubberyness [sic] so that they cannot be masticated in the same way that natural meat products are masticated, for example, and the flavor thereof often possesses undesired characteristics. In addition, the spinning solution possesses a higher viscosity in operation than is preferred. It has been found in accordance with the present invention that *all of these disadvantages can be overcome and additional advantageous results secured* if the protein is treated with a sulfite during the process of preparing edible protein products. [Emphasis added.]

The advantageous results are stated to be:

> * * * The protein filaments are lighter in color than the filaments secured when a sulfite is not employed. It is found that the flavor of the edible protein product has been unexpectedly improved and that it has a more desirable structure. Specifically the structure of the product causes it to break without rubberyness [sic] when chewed so that the product has the tenderness desired for meat products. Whether the sulfite is mixed with the original protein or is added to the spinning solution, the viscosity of the spinning solution is lowered, thereby lowering power consumption and increasing the protein level which can be utilized. Finally, the protein product of the present invention exhibits increased resistance to bacterial and fungal growth.

The main thrust of appellants' argument is that teachings of Smith are taken from a nonanalogous art which one of ordinary skill in the field of edible protein would not be aware of. The Patent Office reply is that as both appellants and Smith were concerned with the problem of overcoming the undesirable dark color of protein, the teachings of Smith would be knowledge which one of ordinary skill in the edible protein art would be aware of.

It seems to me that the reasoning of the Patent Office begs the question and proceeds from too narrow a basis in deciding whether the teachings of Smith are properly to be considered in making the determination of obviousness under the terms and limitations of section 103. The proper basis upon which this decision must be made, if the terms of section 103 are to be honored, is as follows. Appellants sought to discover a new method by which an improved edible protein product could be made. The results sought included improved flavor, tenderness, texture, color, and efficiency in preparation. These results were, in effect, required to overcome the deficiencies in the prior art teachings in the relevant art. Faced with *this* problem, the totality of the deficiencies in the prior art, the inquiry is whether one of ordinary skill in the edible protein art would turn to the protein paper coating art or more broadly to the industrial protein art to solve these problems. The Patent Office answers, in effect, "Yes," and this for the sole reason that *one aspect* of the problem solved by appellants is to achieve a lighter color of the protein and Smith allegedly does this.

I do not agree with this reasoning. It makes obvious by hindsight what had eluded the workers in the art prior to appellants' invention. Followed to its logical conclusion, totally unrelated fields of research and inventive activity may be combined *after the combination is taught* by appellants. This is the precise result which section 103 tried to prevent. The "prior art" therein referred to is that art to which the claimed subject matter as a whole pertains, and not to art to be located only *after* the

invention, and with hindsight as a guide, through all fields of research to find but one aspect in common. It seems to me that should the Patent Office view prevail, there is no end to the string of hindsight reconstruction which could be made to provide a thread and make *all* prior art relevant to the section 103 determination. I do not think this was the intent or purpose of Congress in enacting this provision.

Under section 103 it seems to me that the Patent Office has failed in its burden of proof to show that one of ordinary skill in the art of edible protein products would have been aware of teachings in the paper coating and industrial protein art to solve the existing problem in the edible protein art.

The majority states, "We appreciate appellants' arguments directed to the allegedly nonanalogous nature of the Smith patent to the problem at hand." I fail to see from the majority opinion how or in what manner the majority "appreciates" appellants' arguments. It immediately then states an unsupported conclusion that the claimed improvements "might well be expected * * * in view of the Smith reference." The majority then concludes, absent any explanation, "Considering all the evidence, we think sufficient reason is provided by the prior art for doing what appellants have done". Nowhere does the majority explain or set forth its reasoning as to why it considers the nonanalogous art teachings of Smith proper here for consideration of the issue under section 103.

It is my view, considering the record herein, that the reasoning advanced by the Patent Office is not supported and does not overcome the fact that the Smith reference has been selected by hindsight from a nonanalogous art. As such, it is my position it does not support the rejection under section 103. Considering the teachings of Boyer alone, I finds appellants' invention to be nonobvious and would reverse the decision of the board.[1]

1. Perhaps the rationale for the majority's decision is contained in its conclusion that it finds "no reversible error in the decision below" in combination with the quotation from Webster's New International Dictionary, 3rd Edition, 1961 (appellants' filing date is January 29, 1962), in footnote 2 of the majority opinion. It seems to me that this is an explicit recognition that the art of record is lacking in its support of the rejection. The burden of producing prior art to render an invention obvious under section 103 is that of the Patent Office.

Insofar as the majority sua sponte relies on the "facts" set forth in footnote 2, appellants' brief sets forth the following argument *based on facts of record:*

Moreover, one skilled in the art and having a knowledge of the effects of conventional bleaches on edible proteins would avoid the introduction of a bleach such as sulfite into the Boyer process. The affidavit of William B. Brew * * * filed October 16, 1963, while the application was still pending before the Examiner, clearly establishes this point. In that affidavit, Mr. Brew stated under oath that he followed the teachings of the instant application, but in lieu of the sulfite employed by applicants, he used three other conventional bleaches, namely, sodium hypochlorite, calcium hypochlorite, and hydrogen peroxide. The resultant protein products possessed unsatisfactory flavor and aroma, poor texture, and they tended to deteriorate within a short span of time. Thus, the affidavit established that conventional bleaching agents such as these have no beneficial effect on texture, flavor, aroma, or general appeal. The mere fact that certain sulfite bleaching agents lighten industrial proteins would provide no incentive for the skilled worker to try them on edible protein products and no hint that new and unexpected results would flow from their application to the Boyer process. In view of the affidavit, it seems clear that one seeking to improve the flavor, texture, aroma, and general appeal of the Boyer product would have no reason to look to bleaching agents since these well-known bleaching agents are undesirable. * * *

The board in its opinion answered the above argument by stating the affidavit was "not considered pertinent." No explanation was given. I fail to see how the board can ignore *facts* in its determination of obviousness under section 103.